**In re T.F. STONE COMPANIES, INC., Reorganized Debtor.**

**T.F. STONE COMPANIES, INC., Plaintiff,**

v.

**Lucy HARPER, County Treasurer of Bryan County, Oklahoma, Defendant.**

Bankruptcy No. 389–34130 RCM–11. Adv. No. 393–3743.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

July 7, 1994.

Samuel M. Stricklin, Sheinfeld, Maley & Kay, P.C., Dallas, TX, for plaintiff.

Jeff Mixon, Asst. Dist. Atty., Durant, OK, for defendant.

### MEMORANDUM OPINION

ROBERT McGUIRE, Chief Judge.

On May 9, 1994 came on to be heard the motion of T.F. Stone Companies, Inc., a reorganized debtor ("Debtor" or "Plaintiff") for summary judgment and the cross motion for summary judgment filed by Lucy Harper, County Treasurer of Bryan County, Oklahoma ("Bryan County" or "Defendant"). Pursuant to Bankr.R. 7052, the following are the Court's findings of fact and conclusions of law in connection with such motions. The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the General Order of Reference in this District. Also see, *U.S. v. Nordic Village, Inc.,* —— U.S. ——, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (*"Nordic Village"*). This is a core proceeding under 28 U.S.C. § 157(b)(2)(H).

In July 1985, Debtor acquired title to property in Bryan County (the "Property") from Alfred Odell Wood. Debtor had title to the Property continuously through October 1, 1990. Debtor failed to pay the 1989 ad valorem taxes on the Property.

Debtor filed its Chapter 11 petition on July 3, 1989. Bryan County was not listed as a creditor on Debtor's schedules. Debtor listed the Property in its schedule of assets. The Property was described as "Approximately 5 acres of rural land outside Kingston, OK with trailer lodgings." (Statement of All Property of the Debtor Schedule B–1). Debtor stated a value of *$65,000.* Kingston, Oklahoma is in Marshall County, not Bryan County. Notice of the bankruptcy was not filed in the Bryan County property records. The Property was property of the bankruptcy estate as of July 3, 1989.

On October 1, 1990, Defendant conducted a sale of the Property to satisfy the delinquent taxes, as authorized under Okla.St.Ann. tit. 68, §§ 3105 and 3107 (West 1994). Bryan County did not receive any bids on the Property at the sale. Okla.St.Ann. tit. 68 § 3108 (West 1994) provides that the county treasurer may "bid off" property in the amount of the taxes due and the county obtains all the rights, both legal and equitable, that any other purchaser would acquire. The treasurer notes the bid off in his records. § 3108. Defendant bid off the Property under § 3108 at the October 1, 1990 sale. In effect, it appears that the Bryan County bid off return is the memorialization of a lien for taxes at such time. Okla.St.Ann. tit. 68 § 3111 describes the rights a purchaser at such a sale would acquire from the county:

> The purchaser of any tract of land sold by the county treasurer for taxes shall be entitled to a certificate in writing describing the land purchased and the sum paid, and the time when the purchaser will be entitled to a deed.... The purchaser shall have a lien on the land for the delinquent taxes and if he subsequently pays the taxes levied on said sale, he shall have the same lien for said delinquent taxes and may add said delinquent taxes to the amount paid by him in the purchase.... Such certificate shall be substantially in the following form: [etc.]

Plaintiff acquired a right of redemption from that sale under Okla.Stat.Ann. tit. 68 § 3113 (West 1994). Plaintiff retained a right to redeem the Property by paying the delinquent taxes within two years.

▮ Defendant never filed a motion to lift stay prior to conducting the foreclosure sale on the Property. The stay has never been lifted in regards to the Property. Defendant never filed a proof of claim in the bankruptcy. Plaintiff concedes for the purpose of this motion that Defendant never had notice of the bankruptcy prior to any of its actions. Actions taken in violation of the stay are voidable, not void. *Matter of Pointer*, 952 F.2d 82 (5th Cir.1992); *Sikes v. Global Marine, Inc.*, 881 F.2d 176 (5th Cir.1989). For reasons stated hereafter, the Court will not void the actions taken by Defendant.

Plaintiff never redeemed the Property. Defendant then conducted a resale of the Property on June 14, 1993. Okla.Stat.Ann. tit. 68 § 3125 provides for the resale of unredeemed properties after a two year period. Dickie and Carolyn Kidd ("Kidds" or "Purchaser") purchased the Property at the sale for $325 (Umsted Affidavit), and were given a deed to the Property by Bryan County. (Debtor's Exhibit D). The sale of the Property to the Kidd's extinguished Debtor's right of redemption. Okla.Stat.Ann. tit. 68 § 3113 (West 1994). It is undisputed that the sale was conducted in accordance with all Oklahoma state laws, and that there was no collusion present. Stone's Affidavit places a range of market value of the entire Property at $50,000 to $65,000. Defendant does not contest this valuation.

In n. 6 of Plaintiff's brief, Plaintiff advises that Plaintiff hereafter purchased the Property from the Kidds for $39,500 and dismissed the Kidds from litigation then pending in Oklahoma State Court.

Plaintiff then filed a § 549 action against Defendant in the bankruptcy case on October 21, 1993.

In ruling on a motion for summary judgment, the Court must determine whether there is any issue of material fact, and if none exists whether the moving party is entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Any inferences to be drawn must be viewed in the light most favorable to the opposing party. *Matsushita Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The parties admit that no issues of material fact exist.

## I. Sovereign Immunity

Section 106(a) provides the statutory scope of sovereign immunity in bankruptcy proceedings. Section 106(a) states:

### § 106 Waiver of Sovereign Immunity

(a) A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

There is a three part test that must be met to have a waiver of sovereign immunity under § 106(a): (1) a claim against the government must exist; (2) the claim must be property of the estate; and (3) the governmental unit must have a claim against the debtor that arises out of the same transaction or occurrence. *In re Craftsmen, Inc.*, 163 B.R. 88, 90–91 (Bankr.N.D.Tex.1993).

▮ Prongs one and two of this test are met. This adversary is a claim against a governmental unit. The § 549 transfer cause of action is property of the estate. The remaining question is whether the third prong encompasses a situation where a governmental entity, without notice of the bankruptcy or filing of a proof of claim, forecloses on the estate's property. Restated, is Bryan County's collection on the debt outside of the bankruptcy proceeding a claim that triggers § 106(a)? *See generally*, Richardson, *After Nordic Village—Sovereign Immunity is Still Not in From the Cold*, ABI INSTITUTE JOURNAL, Vol. XIII, No. 4, pp. 19 *et seq.*, May 1994.

▮ Many courts have held that § 106(a) does not require the filing of a proof of claim to waive sovereign immunity. See *In re Gribben*, 158 B.R. 920 (S.D.N.Y.1993); *In re Germaine*, 152 B.R. 619, 624 (9th Cir. BAP 1993); *In re Town & Country Home Nurs-*

*ing Services, Inc.*, 112 B.R. 329 (9th Cir. BAP 1990); *In re Craftsmen, Inc.*, 163 B.R. 88 (Bankr.N.D.Tex.1993); *In re Boldman*, 148 B.R. 874 (Bankr.C.D.Ill.1993); *In re Operation Open City, Inc.*, 148 B.R. 184 (Bankr. S.D.N.Y.1992); *In re St. Mary Hosp.*, 125 B.R. 422 (Bankr.E.D.Pa.1991). However, other courts have held that § 106(a) requires the filing of a proof of claim in order to waive sovereign immunity. *In re 995 Fifth Ave. Associates, L.P.*, 963 F.2d 503, 507 (2nd Cir. 1992) (Stating that "The plain meaning of these words [Section 106(a)] obviously reflects Congress's intent to provide a *waiver* of immunity where 'a governmental unit' files a claim in the bankruptcy court."); *In re Prudential Lines, Inc.*, 79 B.R. 167 (Bankr. S.D.N.Y.1987); *In re Neavear*, 16 B.R. 528 (Bankr.C.D.Ill.1981).

The Supreme Court has twice addressed this issue *in dicta*. In *In re Nordic Village, Inc.*, *supra*, the Court stated:

If the first paragraph of § 106(c) means that, by reason of use of the trigger-word 'entity,' this provision applies *in all respects* to governmental units, then the Government may be sued on all alleged debts, despite the prior specification in subsections (a) and (b) that claims against the Government will lie only when the Government has filed a proof of claim, and even then only as a setoff unless the claim is a compulsory counterclaim.

*Id.* — U.S. at ——, 112 S.Ct. at 1015. The Court provided no further explanation or support for this statement. The opinion focused on the statutory construction of § 106(c).

In *Hoffman v. Connecticut Dept. of Income Maintenance*, 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989) the Court also addressed § 106(a) *in dicta*. The Court first noted:

Neither § 106(a) nor § 106(b) provides a basis for petitioner's actions here, since respondents did not file a claim in either Chapter 7 proceeding.

*Id.* at 101, 109 S.Ct. at 2822. However, the Court continued by noting that § 106(a) uses the word "claim", while § 106(c) does not. The Court stated:

This language differs significantly from the wording of §§ (a) and (b), both of which

use the word "claim," defined in the bankruptcy code as including a "right to payment." See 11 U.S.C. § 101(4)(A).

*Id.* at 102, 109 S.Ct. at 2823. The *Hoffman* Court seems to imply a broader reading of § 106(a) than in *Nordic Village, supra*. Section 106(b) refers to "allowed claim", whereas § 106(a) refers to "claim".

Where the statutory scheme of the Code is coherent and consistent, the Court generally need not inquire beyond the statute's language. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240–41, 109 S.Ct. 1026, 1029–30, 103 L.Ed.2d 290 (1989).

The language of § 106(a) is clear. The statute uses the term "claim", not "proof of claim". Claim is a defined term in the Code. Section 101(5) defines claim as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured;

The explicit language of § 106(a) requires that the trigger of the waiver of sovereign immunity be construed broader than the filing of a proof of claim.

The legislative history also supports this interpretation of § 106(a). *See In re Craftsmen, Inc., supra*. The initial versions of § 106 expressly required the filing of a proof of claim. *See* H.R. 8200, 95th Cong., 1st Sess. 324 (1977); S. 2266, 95th Cong., 2nd Sess. 313 (1978). However, the enacted version of § 106(a) omitted the proof of claim language.

The Supreme Court stated, "Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23–24, 104 S.Ct. 296, 301, 78 L.Ed.2d 17 (1983). The filing of a proof of

claim is not required for the waiver of sovereign immunity under § 106(a).

Bryan County foreclosed upon property of the estate and conducted a tax sale. These actions by Bryan County are sufficient to be an assertion of a claim as defined in § 101(5). As a result, Bryan County has waived sovereign immunity under § 106(a).

## II. Standing

■ The Debtor's joint plan of reorganization provides for the retention of causes of action arising under § 549 in the Debtor. The Court takes judicial notice, in accordance with FRE 201(b), of the Debtor's joint plan of reorganization, confirmed August 29, 1991. Section 6.5 provides in relevant part:

> Section 6.5 *Retained Causes of Action.* On the Effective Date, except as provided otherwise in the Plan or in the Settlement Agreement, all Causes of Action are hereby preserved and retained for enforcement by the Reorganized Debtors whether or not commenced prior to the Effective Date. The Causes of Action retained include, without limitation: . . . (iv) all claims relating to post-petition transactions under Section 549 of the Bankruptcy Code. . . .

Final Joint Plan of Reorganization, § 6.5.

Plaintiff, the Debtor, has standing to bring a § 549 claim against Defendant.

## III. The Statute of Limitations Issue

■ Section 549(d) sets forth the statute of limitations on § 549 actions. A proceeding can be brought within two years of the transfer that is attempting to be avoided or prior to the case being closed or dismissed, whichever event occurs first. In the case at hand, the two year statute of limitation period is the relevant portion.

Defendant argues that the transfer that is sought to be avoided is the tax sale that occurred on October 1, 1990. The adversary was filed on December 21, 1993. If the Defendant is correct, then the statute of limitations has run. Plaintiff asserts that a second transfer occurred when the right of redemption was extinguished concurrent with the resale on June 14, 1993. If Plaintiff's

presumption is correct, then the action is well within the statute of limitations period.

Bryan County bid off the Property on October 1, 1990, as it is permitted to do under Okla.Stat.Ann. tit. 68 § 3108 (West 1994). This sale gave rise to a right of redemption in favor of Debtor. Okla.Stat.Ann. tit. 68 § 3113 (West 1994). The right of redemption exists at a minimum for two years and until the county executes a deed of conveyance. Okla.Stat.Ann. tit. 68 §§ 3113, 3125 (West 1994). The county can then resell unredeemed property two years after the initial sale. Okla.Stat.Ann. tit. 68 § 3125 (West 1994). Bryan County sold the Property to the Kidd's in a valid resale on June 14, 1993, thereby cutting off Debtor's right of redemption. No party contends that the Bryan County violated any of the Oklahoma statutes.

Transfer is a defined term in the Bankruptcy Code. Section 101(54)[1] provides:

> (54) "transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property, including retention of title as a security interest and *foreclosure of the debtor's right of redemption;*

(Emphasis added). The Bankruptcy Code specifically includes foreclosure of a right of redemption as a transfer. As impacted by § 101(54), under the Oklahoma statutes, a transfer occurs when the taxpayer's right of redemption is extinguished. In effect, the extinguishment of Debtor's right of redemption by resale deed is the culmination of the foreclosure of the Debtor's right of redemption. § 101(54).

Foreclosure is legally defined as "[t]o shut out, to bar, to destroy an equity of redemption. *Anderson v. Barr,* 178 Okl. 508, 62 P.2d 1242, 1246." Black's Law Dictionary 646 (6th ed. 1990). *In re Slack–Horner Foundries Co.,* 971 F.2d 577, 582 n. 3 (10th Cir.1992). In the *Slack–Horner, supra,* case, at p. 582, the dissent states:

---

1. There are two sections 101(54) due to a congressional oversight. This opinion refers to the second section 101(54).

... Here, the debtor's equity of redemption was foreclosed by the issuance of the treasurer's deed, and this foreclosure is a transfer within the meaning of section 548....

Three courts have addressed the issue of when a transfer occurs—either the original foreclosure date or the date of the extinguishment of the right of redemption. *See In re Moureau*, 147 B.R. 441 (Bankr.N.D.Ill. 1992); *In re McKeever*, 132 B.R. 996 (Bankr. N.D.Ill.1991); *In re Allegheny Int'l Credit Corp.*, 128 B.R. 125 (W.D.Pa.1991). In *Moureau, supra*, the Court held that the point of transfer occurs upon the expiration of the right of redemption, citing to the *McKeever, supra*, decision. In *In re McKeever, supra*, the Court described the transfers that occurred in a tax sale with redemption rights as:

... The first transfer occurred when the tax lien attached to the property and the debtor's interest became subject to such lien. At this point, the rights of the debtors regarding their real property were involuntarily, albeit conditionally altered. Just as the grant of a mortgage lien or a security interest would constitute a transfer, the creation of a statutory lien transfers an interest in property.

Subsequent to the attachment of the tax lien, a second transfer occurred when the property was sold at the annual tax sale. The tax lien was extinguished along with the personal liability of the debtors for the delinquent taxes and a new type of lien was transferred to the tax sale purchaser as represented by the Certificate of Purchase. Again the debtor's rights with respect to the real property were involuntarily, albeit conditionally altered. The defendant tax sale purchaser argues that the transfer occurred at the time the judgment for tax sale was entered and that the tax sale purchaser merely became a mediate transferee of the original transferee ... to the extent this argument characterizes the tax sale transfer as merely an extension of the prior tax lien transfer, the Court rejects this characterization of the transfer.

*Id.*, 132 B.R. at 1008–09. The *McKeever* court continued:

... Upon expiration of the debtor's redemption period the tax sale purchaser became entitled to obtain a tax deed and acquire legal title to the property. Until such exercise, the Certificate of Purchase does not transfer any ownership interest in the property and legal title remains with the debtors. The expiration of the redemption period and the resulting right to proceed to tax deed, therefore, fundamentally altered the rights of the parties. The debtors were involuntarily divested of their remaining ownership rights at that time, resulting in a transfer within the meaning of § 101(54) and § 548.

*Id.* at 1009. Under Oklahoma law, the foreclosure extinguishment of the right of redemption was not accomplished until the resale deed was recorded and noticed, because, until then, Debtor could still redeem.

However, in *Allegheny, supra*, the Court held that the date of the tax sale, and not the date of the expiration of the redemption, is the date of the transfer for § 548 actions. The Court, in essence, merged the termination of the redemption period in with the initial sale. The Court concluded that the rights of the debtor had been altered at that point.

The reasoning of the *Allegheny* opinion is not compelling. The Bankruptcy Code defines the foreclosure (extinguishing) of a right of redemption as a transfer in and of itself. Bankr.Code § 101(54). It cannot be merged back with the prior tax sale. In *In re Slack–Horner Foundries Co., supra*, the dissenting judge stated:

In my judgment, the foreclosure of an equity of redemption by the issuance of a treasurer's deed simply cuts off the debtor's right of redemption, *see* n. 2 supra, rather than conveying that right to the state.

The debtor's right of redemption was foreclosed or transferred when the Property was conveyed from Bryan County to the Kidds at the resale on June 14, 1993. The statute of limitations on the transfer of the right of redemption began to run on June 14, 1993. This action was filed within the two-year statute of limitations period.

### IV. Is the Defendant an Initial Transferee?

■ Plaintiff asserts that Defendant has liability under § 550(a)(1). This section provides that the plaintiff may recover from an initial transferee for the value of such property. The safe harbor provisions of § 550(b) apply only to § 550(a)(2) claims. If Defendant is an initial transferee under § 550(a)(1), then it cannot rely on § 550(b) as a defense to the transfer.

Okla.Stat.Ann. tit. 68 § 3113 (West 1994) provides that, "[the redemption rights holder] may redeem the same from the lien resulting from the tax sale at any time before the execution of a deed of conveyance therefor by the county treasurer...." Plaintiff issued a County Treasurer's Resale Deed on June 14, 1993, conveying the Property to the Kidds. The deed states in part, "WHEREAS, the said Bryan, County Treasurer, is now by law vested with the power and authority to execute this resale deed...." (Plaintiff's Exhibit D). The county treasurer is without authority to issue a resale deed where the right of redemption is in effect. *Lee v. Myles*, 390 P.2d 489 (Okla.1964); *Burnett v. McGrath*, 293 P. 1102 (Okla.1931). Upon execution of the resale deed, the purchaser obtains an absolute estate in fee simple, absolute subject only to the claims of the state. Okla.Stat.Ann. tit. 68 § 3118 (West 1994).

The Tenth Circuit confronted this issue while analyzing a fraudulent conveyance action resulting from tax sales under Colorado statutes. *In re Slack–Horner Foundries Co.*, 971 F.2d 577 (10th Cir.1992). The transactions in *Slack–Horner* are on point with the ones at hand. The State of Colorado foreclosed on a debtor's property and resold it to a third party after the redemption period. The trustee attempted to recover against the third party purchaser as the initial transferee. The Court concluded that the statutes dictated that the signing of the treasurer's deed caused the debtor's interest in the property to be transferred to the state and then transferred to the purchaser. The court stated: "The interest in the property must have passed to the state in order for the state to issue a deed conveying the prop-

erty to Simons." *Id.* at 580. The dissent states:

> In my judgment, the foreclosure of an equity of redemption by the issuance of a treasurer's deed simply cuts off the debtor's right of redemption, *see* n. 2 supra, rather than conveying that right to the state.

*Id.* at 582 n. 3. The dissent further states at pp. 582–83: "... First, Simons now holds property that once belonged to the debtor. Thus he is clearly a transferee, *albeit not an initial transferee, of that property.*" (Emphasis added).

The Tenth Circuit has interpreted a substantially similar Colorado Statute to hold that the state (or, in our case, Bryan County), not the purchaser, like Kidd, is the initial transferee under § 550. While conceptually the Tenth Circuit analysis may be troublesome, there is no reason to distinguish the Oklahoma Statute or facts in this case from those presented in *Slack–Horner, supra*. In the Tenth Circuit, it appears that Bryan County would be considered the initial transferee for the purposes of § 550(a)(1).

### V. Section 549 and BFP

■ Plaintiff must still satisfy the requirements of § 549(c) to recover from Bryan County. § 549(c) provides a defense for the transferee if the property was transferred for present fair equivalent value. The meaning of this phrase is the subject of conflicting opinions.

The Supreme Court has addressed the meaning of "reasonably equivalent value" in § 548(a)(2)(A) in the context of foreclosure sales. The Court held that the price obtained at a valid foreclosure sale satisfies "reasonably equivalent value". *BFP v. Resolution Trust Corporation*, —— U.S. ——, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (*"BFP"*). Defendant has urged that this analysis should be adopted when construing § 549(c) as well. The Court did not address the applicability of this reasoning when interpreting the language of § 549(c).

In *BFP*, the purchaser took possession of a home pursuant to a prepetition non-tax foreclosure sale. The home was sold for $433,000, but it had a fair market value of at least

$725,000. *Id.* at ——, 114 S.Ct. at 1759. The Court was confronted with the question of whether this constituted "reasonably equivalent value". The Court concluded that "reasonably equivalent value" did not equal fair market value. *Id.* at ——, 114 S.Ct. at 1761. The Court noted the discrepancies between a federal reasonable foreclosure-sale price as specified in *Durrett v. Washington Nat. Ins. Co.*, 621 F.2d 201 (5th Cir.1980) (*"Durrett"*) and historical fraudulent transfer law. *BFP* at —— ——, 114 S.Ct. at 1763–64. The Court noted that it could find no other case prior to *Durrett* where, "[a court] had ever applied the 'grossly inadequate price' badge of fraud under fraudulent transfer law to set aside a foreclosure sale." *Id.* at ——, 114 S.Ct. at 1764. The Court continued:

> Surely Congress has the power pursuant to its constitutional grant of authority over bankruptcy, U.S. Const., Art. I, § 8, cl. 4, to disrupt the ancient harmony that foreclosure law and fraudulent-conveyance law, those two pillars of debtor-creditor jurisprudence, have heretofore enjoyed. But absent clearer textual guidance than the phrase 'reasonably equivalent value'—a phrase entirely compatible with pre-existing practice—we will not presume such a radical departure.

*Id.* at ——, 114 S.Ct. at 1764. (Citations omitted).

The Court further stated "... foreclosure has the effect of completely redefining the market in which the property is offered for sale...." *Id.* at ——, 114 S.Ct. at 1767. The Court concluded:

> We deem, as the law has always deemed, that a fair and proper price, or a 'reasonably equivalent value,' for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with.

*Id.* at ——, 114 S.Ct. at 1765. The Supreme Court abandoned any tie to the use of fair market value when analyzing validly-conducted mortgage foreclosure sales under § 548(a)(2)(A).

Two courts have addressed the applicability of the Ninth Circuit *BFP* opinion to § 549(c).[2] These courts came to divergent results after extended discussions of the issue at hand.

In *In re Bago*, 149 B.R. 610 (Bankr. C.D.Cal.1993), the Bankruptcy Court found that the reasoning of the *BFP* case extended to § 549(c). The Court looked to the underlying policy behind § 548(a)(2)(A) and § 549(c). The Court concluded that the policy behind both sections of the code was to protect good faith purchasers. The Court further discussed the inapplicability of *In re Powers*, 88 B.R. 294 (Bankr.D.Nev.1988).[3]

*In re Powers*, *supra*, held that the language of § 549 must be construed more stringently than the language in § 548. The *Powers* Court struck down a sale where the property had been sold for 73% of the fair market value. The *Powers* court reasoned that post-petition transfers should be treated differently than pre-petition transfers. Post-petition transfers are property of the estate which was transferred in violation of the automatic stay without Court approval. The *Powers* Court concluded that in light of these differences the aim of § 549(c) is to maximize the estate. Therefore, the property must be transferred for near fair market value for a valid defense to exist under § 549(c).

The *Bago* Court concluded that the *Powers*, *supra*, decision was not consistent with the Ninth Circuit's analysis in *BFP*. The *Bago* Court cited two factors in declining to follow *Powers*: (1) the *BFP* Court's strong language favoring upholding non-collusive foreclosure sales and (2) the rejection of the *Durrett* rationale of maximizing the recovery to the estate. The *Bago* Court held that the purchase price at a non-collusive regularly conducted foreclosure sale satisfies the "present fair equivalent value" test.

The Bankruptcy Appellate Panel has also addressed the meaning of present fair equivalent value in § 549(c) after the Ninth Circuit BFP decision. *In re Shaw*, 157 B.R. 151 (9th

---

**2.** The Supreme Court opinion has yet to be addressed by any court in this context.

**3.** *In re Powers* was decided prior to the Ninth Circuit *BFP* decision.

Cir. BAP 1993). In *Shaw,* the Court focused on the differences in the language in §§ 548 and 549. The Court concluded that the difference in the language signaled that Congress intended for different results under the code sections. *Id.* at 153 (Citing *Energy Research Foundation v. Defense Nuclear Facilities Board,* 917 F.2d 581, 582 (D.C.Cir. 1990)). The Court then adopted the stricter reading of § 549(c) providing that, in order to satisfy the requirements of "present fair equivalent value" there must be little deviation from fair market value in the price obtained at the foreclosure sale. *Id.* at 153–54 (Citing *In re Powers, supra,* and *In re Auxano, Inc.,* 96 B.R. 957, 963 (Bankr W.D.Mo. 1989)).

The general policies set forth in the *BFP, supra,* opinion appear to apply in this case as well. The Supreme Court required clear congressional intent from the language in the Code to overturn prior foreclosure law. The Supreme Court's rationale to protect *bona fide* purchasers appears to be no less applicable to a § 549 transfer in a non-collusive tax foreclosure sale as it is in a § 548 transfer by way of a mortgage foreclosure sale. Footnote 3 in the *BFP, supra,* opinion does explicitly reserve a ruling on tax sales. Footnote 3 reads:

> We emphasize that our opinion today covers only mortgage foreclosures of real estate. The considerations bearing upon other foreclosures and forced sales (to satisfy tax liens, for example) may be different.

*Id.* —— U.S. at ——, n. 3, 114 S.Ct. at 1760, n. 3. The rationale behind the *BFP, supra,* decision appears to be likewise compelling in a tax sale foreclosure under § 549(c). *In re War Eagle Floats, Inc.,* 104 B.R. 398 (Bankr. E.D.Okla.1989). This is not to say that a persuasive argument cannot be made for following the *In re Shaw, supra,* decision; however, this Court finds the *In re Bago, supra,* opinion more compelling when viewed in conjunction with the Supreme Court's analysis in *BFP, supra.* The price obtained at a non-collusive tax foreclosure sale, conducted in accordance with all state laws, presumptively meets the "present fair equivalent value" standard in § 549(c).

Accordingly, Defendant's motion for summary judgment is granted. Plaintiff's motion for partial summary judgment is denied.

### FINAL JUDGMENT

For the reasons contained in the Memorandum Opinion signed this date,

It is, therefore, **ORDERED** that Plaintiff T.F. Stone Companies, Inc. take nothing from Defendant Lucy Harper, County Treasurer of Bryan County, Oklahoma on claims asserted in Plaintiff's complaint.